NOTICE: NOT FOR PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION DOES NOT CREATE
LEGAL PRECEDENT AND MAY NOT BE CITED EXCEPT AS AUTHORIZED.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

CHRISTOPHER HERNANDEZ, *Appellant.*

No. 1 CA-CR 13-0708
FILED 11-10-2014

Appeal from the Superior Court in Maricopa County
No. CR2011-149622-001
The Honorable Daniel G. Martin, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joseph T. Maziarz
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Jeffrey L. Force
*Counsel for Appellant*

_____

**MEMORANDUM DECISION**

Judge Peter B. Swann delivered the decision of the Court, in which Presiding Judge John C. Gemmill and Judge Patricia A. Orozco joined.

_____

**S W A N N**, Judge:

¶1          Defendant Christopher Hernandez appeals from his conviction and sentence for manslaughter.  This case comes to us as an appeal under *Anders v. California*, 386 U.S. 738 (1967), and *State v. Leon*, 104 Ariz. 297, 451 P.2d 878 (1969). Defendant's appellate counsel has searched the record on appeal and found no arguable, nonfrivolous question of law, and asks us to review the record for fundamental error.  *See Anders*, 386 U.S. 738; *Smith v. Robbins*, 528 U.S. 259 (2000); *State v. Clark*, 196 Ariz. 530, 2 P.3d 89 (App. 1999).  Defendant was given the opportunity to file a supplemental brief *in propria persona* but did not do so, despite our grant of an extension of time.

¶2          We have searched the record for fundamental error and find none. Accordingly, we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶3          The state indicted Defendant on two counts of second-degree murder for allegedly causing the deaths of A.S. ("Count 1") and R.M. ("Count 2"). Defendant pled not guilty and the case proceeded to a jury trial.  Because Defendant eventually pled guilty to an amended version of Count 1, however, we limit the scope of our review to his conviction and sentence on Count 2, and include facts related to Count 1 only for contextual purposes.  *See* A.R.S. § 13-4033(B) ("In noncapital cases a defendant may not appeal from a judgment or sentence that is entered pursuant to a plea agreement . . . .").

¶4          At trial, the state presented evidence of the following facts.  In the early morning of July 24, 2011, a number of cars were stopped in the eastbound lanes of an intersection.  A black Cadillac Escalade was stopped in the inside through-lane, a maroon Chevrolet Monte Carlo was stopped in the outside through-lane and to the right of the Escalade, and Defendant's white Chevrolet Avalanche was stopped behind the Monte Carlo.  Defendant's girlfriend was driving the Avalanche, with Defendant seated in the front passenger seat and their friend R.M. seated in the rear seat.

¶5          During the stop at the intersection, a verbal altercation arose between occupants of the Escalade and the Monte Carlo.  At one point A.S. exited

the Escalade through the rear passenger door and positioned himself between the door and the vehicle. As the altercation intensified, the drivers of the Escalade and the Monte Carlo both brandished handguns and began shooting in each other's direction.

¶6 Defendant and R.M. exited the Avalanche just before the shooting commenced, and shortly thereafter Defendant fatally shot A.S. with his handgun. As Defendant and R.M. returned to the Avalanche, an argument arose between them about possession of Defendant's gun. While the Avalanche was still stopped at the intersection, Defendant suddenly told his girlfriend that R.M. had been shot and that she needed to drive to the hospital. Defendant's girlfriend later testified that R.M. had tried to grab Defendant's gun from the center console once they were back in the Avalanche, but because she had been ducking under the dashboard, she never saw R.M. actually touch the gun and never heard or saw a gun discharge inside the vehicle. R.M. was deceased when the Avalanche arrived at a hospital shortly after the shooting.

¶7 An autopsy confirmed that R.M. died from a gunshot wound to his head. Police eventually found a handgun with bloodstains on it hidden in a toolshed connected to Defendant's residence. Defendant then admitted that his gun had been inside the Avalanche on July 24, but claimed that R.M. had grabbed it from the center console and denied any knowledge of how R.M. had been shot. Defendant further admitted that he had hidden his gun outside of the hospital before police arrived and later moved it to his toolshed.

¶8 The ensuing police investigation confirmed that the bullet that killed R.M. had been fired from Defendant's gun inside the Avalanche. A detective with experience in bloodstain interpretation opined that R.M. had to have been seated in the rear driver-side seat when he was shot, and that it was impossible for his head to have been anywhere near the center console of the vehicle. The medical examiner who performed the autopsy on R.M. opined that the tears along R.M.'s entry wound coupled with the surrounding soot deposit indicated that the fatal shot was fired less than an inch away from R.M.'s head. A forensic investigator similarly opined that the gun was fired no more than four inches away from R.M.'s head. The forensic investigator also opined that based on his analysis of the blood pattern, R.M. did not hold any object in his right hand when the shot was fired. The investigator could not, however, rule out that R.M. had held something in his left hand or that he had let go of something in his right hand before the shot was fired. Finally, a criminologist testified that Defendant's gun was working properly and that the force required to pull the trigger was between ten and ten-and-a-half pounds.

¶9          Defendant moved for judgment of acquittal on both charges, which the court denied.  Defendant proceeded to testify in his defense, confirming that he owned the gun that killed R.M., but again asserting that it had accidentally discharged as R.M. grabbed for it near the center console.  Defendant also admitted to repeatedly lying to law enforcement during the investigation about what had happened on July 24, and about the location and caliber of his gun.

¶10         The jury deadlocked as to Count 1 and the court ultimately declared a mistrial on that charge.  As to Count 2, the jury returned a verdict of guilty on the lesser-included offense of manslaughter.  During the aggravation phase, R.M.'s mother testified about the emotional and financial impact of Defendant's offense.  The jury found that the crime committed was a dangerous offense, and also found the presence of two aggravating factors: (1) the offense involved the use of a deadly weapon; and (2) the offense caused emotional or financial harm to the victim's immediate family.

¶11         Defendant moved for a new trial based on alleged juror misconduct, but withdrew the motion.  Before sentencing, Defendant pled guilty to manslaughter on Count 1 and agreed to be sentenced to a concurrent prison term based on his sentence on Count 2.  After weighing the aggravating and mitigating factors presented, the court sentenced Defendant to concurrent prison terms of 15 years on each count and granted him 161 days of presentence incarceration credit.  Defendant timely appeals.

## DISCUSSION

¶12         Our review of the record reveals no fundamental error.  Defendant was present and represented at all critical stages.  The record shows no evidence of jury misconduct, and the jury was properly comprised of 12 jurors.  *See* A.R.S. § 21-102(A); Ariz. R. Crim. P. 18.1(a).  The state's closing and rebuttal arguments were proper.

¶13         The evidence that the state presented at trial was properly admissible and was sufficient to support Defendant's conviction for manslaughter.  Although Defendant was charged with second-degree murder, the jury was properly instructed on the lesser-included offense of manslaughter.  A person commits manslaughter by recklessly causing the death of another person.  A.R.S. § 13-1103(A)(1).  In this context, "recklessly" means that the person who caused the death was "aware of and consciously disregard[ed] a substantial and unjustifiable risk [of death]," and that "the risk [was] of such nature and degree that disregard[ing it] constitute[d] a gross deviation from the standard of conduct that a reasonable person would observe in the situation."  *Id.* § 13-105(10)(c).

4

¶14　　　Here, the state presented ample evidence from which the jury could reasonably conclude that Defendant recklessly caused R.M.'s death by discharging his gun less than four inches from R.M.'s head. *See State v. West*, 226 Ariz. 559, 562, ¶ 16, 250 P.3d 1188, 1191 (2011) ("[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (citation omitted)); *see also State v. Scott*, 113 Ariz. 423, 424-25, 555 P.2d 1117, 1118-19 (1976) ("Reversible error based on insufficiency of the evidence occurs only where there is a complete absence of probative facts to support the conviction."). The jury could reasonably disbelieve Defendant's account of the incident in light of the circumstances and testimony presented, including Defendant's repeated lies to law enforcement during the investigation. *See State v. Cox*, 217 Ariz. 353, 357, ¶ 27, 174 P.3d 265, 269 (2007) (holding that jury resolves witness credibility). The evidence presented was also sufficient to support the jury's findings of dangerousness and aggravating factors. *See* A.R.S. §§ 13-105(13) (offense involving use of deadly weapon constitutes "dangerous offense"), -701(D)(2) (use of deadly weapon may constitute aggravating circumstance), -701(D)(9) (physical, emotional or financial harm to victim's immediate family as a result of victim's death constitutes aggravating circumstance).

¶15　　　Before imposing sentence, the court ordered and considered a presentence report. Defendant was given an opportunity to speak at the sentencing hearing, and the court stated on the record the evidence and materials it considered and the factors it found in imposing sentence. The court imposed legal sentences for the offenses, *see* A.R.S. §§ 13-704(A), -1103(C), and correctly calculated Defendant's presentence incarceration credit under A.R.S. § 13-712(B).

## CONCLUSION

¶16　　　We have reviewed the record for reversible error and find none. *See Leon*, 104 Ariz. at 300, 451 P.2d at 881. We therefore affirm.

**¶17**  Defense counsel's obligations pertaining to this appeal have come to an end. *See State v. Shattuck*, 140 Ariz. 582, 584-85, 684 P.2d 154, 156-57 (1984). Unless, upon review, counsel discovers an issue appropriate for petition for review to the Arizona Supreme Court, counsel must only inform Defendant of the status of this appeal and Defendant's future options. *Id.* Defendant has 30 days from the date of this decision to file a petition for review *in propria persona. See* Ariz. R. Crim. P. 31.19(a). Upon the court's own motion, Defendant has 30 days from the date of this decision in which to file a motion for reconsideration.



Ruth A. Willingham · Clerk of the Court
F I L E D : gsh